OPINION
BOLGER, Justice.
I. INTRODUCTION
The superior court terminated a mother's parental rights based on evidence of her chronic delusions and the danger these delu *982 sions posed to her child. On appeal, the mother argues that several aspects of the court's decision are not adequately supported. In particular, she argues that the Office of Children's Services (OCS) should have required an assessment of her psychiatric condition and monitored the course of her psychological therapy. But the record shows that the mother did receive a psychiatric evaluation at OCS's direction and that it would likely have been harmful to disrupt the positive relationship she had with her counselor. We thus conclude that the record supports the superior court's conclusion that OCS fulfilled its duty to make active efforts to provide this mother with services designed to prevent the breakup of her family.
II. FACTS AND PROCEEDINGS
Ronnie L. was ten years old when he was taken into OCS custody on July 31, 2009.[1] On July 6, 2009, OCS received a protective services report stating that Ronnie's mother, Grace, had appeared with him at a hospital emergency room, complaining that they had been sexually assaulted by women. The report reflected that Grace showed no physical signs of sexual abuse and that Ronnie denied knowledge of any abuse. Christine Sheridan, the social worker who investigated the report, interviewed Grace and Ronnie.
Because Grace was exhibiting troubling behavior, June Ober of Mat-Su Behavioral Health Services provided a crisis sereening. Grace told Ober that she had taken medications for mental illness in the past but that she had not stayed on them because she disliked their side effects. Ober recommended that Grace participate in a psychological evaluation and receive medication. Grace signed a safety plan and agreed to seek mental health treatment in order to keep Ronnie safe. Sheridan attempted multiple times to follow up with Grace, but when she finally reached Grace by phone on July 20, 2009, Grace told her that she had consulted a lawyer and did not intend to participate in treatment for her mental illness.
OCS then filed an emergency petition to have Ronnie adjudicated a child in need of aid. The petition cited a number of protective services reports received over many years by OCS and OCS's attempts to intervene with the family. The petition conelud-ed:
[Grace] has demonstrated she will not follow through with the department's recommendations or follow through with her treatment plan regarding her mental health. Currently [Grace] is not on any psychotropic medication and [is] refusing treatment. [Ronnie] is exposed to her paranoia and frightening delusions on a daily basis.... [Children's Services Specialist] Sheridan and Supervisor Jones have observed [Ronnie] demonstrating paranoid behaviors....
The department feels that [Ronnie] is negatively impacted by his mother's untreated mental illness and intervention is required at this time.
The superior court held an emergency hearing and authorized OCS to take Ronnie into custody.[2]
OCS referred Grace for an assessment with clinical psychologist Dr. Grace Long, who reviewed Grace's medical history and conducted a brief interview with her. Dr. Long recommended that Grace continue in therapy, and that she also be evaluated by a psychiatrist to determine if medication would be appropriate for her.
Soon thereafter OCS entered into a case plan with Grace that identified Grace's priority needs as "[uJnresolved chronic or severe diagnosed mental health problems, [hJealth problem - or disability, [and] [iIneffec-tive/harmful parenting skills." The plan stated that Grace "has [al long history of untreated mental health and instability in her life." The plan acknowledged that Grace and Ronnie share a strong, supportive, loving bond. It called for Grace to engage in mental health services and follow all recom *983 mendations, and its stated goals for Grace included decreasing or stopping the delusions, obtaining stable housing, completing a course of parenting classes, and participating in regular visitation with Ronnie.
In March 2010 Grace participated in a psychological evaluation with Dr. Melinda H. (Glass, to whom OCS had referred her. The purpose of the evaluation was to determine how Grace's mental illness impacted her ability to act as an appropriate and protective parent. Grace told Dr. Glass that she had been working with Richard Gustafson, a clinician at South Central Foundation Behavioral Health; Grace stated that she wanted Gus-tafson to discuss the results of the evaluation with her.
Dr. Glass interviewed Grace, administered a number of tests, and reviewed collateral information. Dr. Glass diagnosed Grace with disorder, mixed type, primarily persecutory and grandiose." She reported that Grace "has been inconsistent in her accessing of mental health treatment, in spite of it repeatedly being recommended. She has been fairly consistently diagnosed with delusional disorder with some questions of schizophrenia, but has apparently only taken medication for a short period of time."
Dr. Glass concluded that Grace "is likely to experience great difficulty safely and appropriately parenting any child ... and is likely to be unable to provide [Ronnie] with guidance or stability." Dr. Glass noted indications that Grace had involved Ronnie in her delusions in the past, and she stated that such involvement "would have the potential of being destructive for him and his developing understanding of reality." Dr. Glass concluded, "As long as [Grace] continues to funetion with an untreated delusional disorder she has the potential of causing great harm to her son as well as to herself."
Dr. Glass stated that, while it was important for Grace to receive mental health treatment if she were to have a safe and appropriate parenting relationship with Ronnie, her persecutory delusions would likely hinder her ability to participate in treatment. Dr. Glass noted that Grace appeared to have a good relationship with Gustafson, who "appears to understand some of her problems." Dr. Glass recommended that Grace continue in therapy, that she be referred to a psychiatrist for a medication review, and that she take any recommended medication to try to improve her ability to discern reality. Dr. Glass noted that Grace "is unlikely to do this without a court order, and may not even then."
In addition to referring Grace to Dr. Glass for an evaluation, OCS helped her locate stable housing, enroll in multiple parenting classes, and engage in family contact with Ronnie.
In June 2011 OCS filed a permanency report indicating that while Grace had attended parenting classes and therapy sessions with Gustafson, she had not resolved her mental health issues to the extent necessary to allow her to provide a safe and stable home for Ronnie,[3] she had not sought medication or direct intervention to address her mental illness, and she had refused to divulge her housing situation to OCS.
On January 6, 2012, OCS filed a petition to terminate Grace's parental rights to Ronnie. On May 3, 2012, in preparation for the termination trial, Dr. Glass conducted an updated psychological evaluation of Grace. Dr. Glass's report noted that Grace's delusional behaviors were ongoing. It stated that Grace's response pattern, in which she "endorsed a significant number of psychological symptoms related to paranoia, dissociation, flashback, and avoidance," was similar to her earlier evaluation, but that Grace "presented with more symptoms of depression than she did in the previous evaluation." Dr. Glass diagnosed Grace with "[dJelusional disorder, mixed type, primarily persecutory and grandiose," and identified "[mJood disorder, [not otherwise specified]" as a rule-out diagnosis.
In her conclusions, Dr. Glass stated that Grace's "delusions appear somewhat more bizarre than they did in the previous evaluation," and she noted that "[in this evaluation she had difficulty completing an interview or making sense. It would appear that her *984 paranoia is heightened and her ability to stay grounded in reality is less than it was in the past evaluation." Dr. Glass went on to state that Grace demonstrated no positive changes to her mental health status but instead appeared "somewhat worse." Dr. Glass found that "(treatment does not appear to be helping [Grace] address her mental illness and it is not known whether medication would have a significant impact. It is unlikely [Grace] would consider it as she has refused medication in the past."
The superior court held a trial on OCS's petition to terminate Grace's parental rights in May and August 2012. Following the trial, the superior court terminated Grace's parental rights to Ronnie.
Grace appeals the order terminating her parental rights. She argues that the superi- or court erred in finding that; (1) Ronnie was a child in need of aid; (2) Grace did not remedy in a timely fashion conduct or conditions that endangered Ronnie; (8) OCS made active reunification efforts to allow Ronnie to be returned to Grace's care; (4) Ronnie would likely suffer serious physical or emotional damage if Grace's custody were not terminated; and (5) termination of Grace's parental rights was in Ronnie's best interests. She also argues that she received ineffective assistance of counsel during the superior court proceedings.
III. STANDARDS OF REVIEW
In child in need of aid cases we review a superior court's factual findings for clear error[4] We review questions of law de novo.[5] A finding is clearly erroneous if our review of the entire record in the light most favorable to the party that prevailed at trial leaves us definitely and firmly convinced that the finding is mistaken.[6] Whether OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law.[7] We review de novo "a request for disqualification of a judge based on the appearance of impropriety." [8]
IV. DISCUSSION
A. The Superior Court Did Not Err When It Concluded That Ronnie Was A Child In Need Of Aid, That Grace Did Not Remedy The Conditions That Placed Ronnie At Risk Of Harm, And That Ronnie Would Likely Suffer Serious Harm If Grace's Custody Were Continued.
Before terminating parental rights, a superior court must find, by clear and convincing evidence, that the child was in need of aid and that the parent did not timely remedy conduct or conditions that placed the child at risk of harm.[9] When, as here, the child is an Indian child, the superi- or court must find, by evidence beyond a reasonable doubt, that the child would likely suffer serious physical or emotional harm if the parent's custody were to continue.[10] The superior court made these findings in this case, basing them on the testimony and report of Dr. Glass. The superior court found Dr. CHlass's testimony "quite credible" and noted that no expert testimony was presented that would call into question Dr. Glass's assessment and conclusions.
Grace argues that OCS did not present any evidence to support the superior court's finding that she had a mental illness that placed Ronnie at risk of harm.[11] But *985 the report that Dr. Glass prepared for the termination trial described Grace's bizarre delusions and her heightened paranoia. Dr. Glass concluded that Grace would likely include Ronnie in her delusional process if she had more contact with him and that exposure to her delusions would require Ronnie to become her caretaker or to completely disengage from her. Dr. Glass thus concluded that Grace had the potential to cause Ronnie great physical or psychological harm or to expose him to such harm from others.
Grace also argues that the superior court erred in finding that she had not remedied the conditions that placed Ronnie at risk of harm. But Dr. Glass testified that Grace's mental condition over the course of the case had worsened rather than improved, and the superior court found Dr. Glass's testimony credible. Grace does not address this aspect of Dr. Glass's testimony in her brief on appeal.
Grace also briefly argues that the superior court erred in finding that Ronnie would likely suffer serious emotional or physical damage if Grace's custody were to continue. The superior court based this finding on evidence that Ronnie was "very parenti-fied" when he was living with Grace,[12] and on Dr. Glass's testimony that if Ronnie were returned to Grace, his parentification would recur and would be harmful to him, that Grace does not understand Ronnie's basic needs and would be incapable of meeting those needs, and that Ronnie would be harmed by having to determine which of Grace's behaviors were delusional and how to respond to her delusional behavior. Dr. Glass's report stated that Grace would "experience great difficulty safely and appropriately parenting any child." (Emphasis added).
In general, Grace argues that Dr. Glass's testimony should be discounted because Dr. Glass was unaware of progress she had made and the fact that she now had stable housing, and because Dr. Glass testified that Grace's delusions did not involve Ronnie. But Dr. Glass evaluated Grace only a few weeks before the termination trial, and the superior court noted that any progress Grace had made with Gustafson was a matter of treating symptoms rather than treating Grace's underlying delusional disorder. And although Dr. Glass acknowledged that Grace's recent delusions might not have directly involved Ronnie, these delusions had involved Ronnie when he was living with her, and they were a cause of Ronnie's removal from her home.
The superior court's findings on these issues appear to be adequately supported by Dr. Glass's testimony. We conclude therefore that the superior court's findings were not clear error.
B. The Superior Court Did Not Err When It Determined That OCS Made Active Reunification Efforts.
A superior court may not terminate parental rights to an Indian child unless it finds, by clear and convincing evidence, that OCS made reasonable and active efforts to provide services and programs designed to prevent the breakup of the Indian family.[13] The superior court made that finding here, noting that OCS's efforts included providing Grace with visitation, assessments, transportation assistance, referrals for counseling, contact with Grace's counselor, and meetings with OCS. Grace challenges this finding, arguing that her delusions persisted because OCS failed to implement Dr. Glass's recommendation that she be referred for a psychiatric evaluation.
The necessity for a psychiatric assessment was addressed by the superior court during hearings in January and February 2010. At the adjudication hearing on January 20, OCS *986 requested a continuance, noting that Grace had refused to participate in a psychological evaluation or to discuss medication management with her OCS social worker. OCS asked the court to order Grace to participate in a psychological evaluation and to meet with a psychiatrist to discuss medication.
Grace initially objected to these requests. But later in the hearing, Grace agreed to work with Gustafson at Southcentral Foundation to set up a psychological evaluation and a psychiatric assessment. When the court convened on February 18, Grace reported that she had scheduled a psychiatric appointment with Dr. Tim Harvey at South-central Foundation the following week.
On February 23, 2010, Grace saw Dr. Harvey at Southcentral Foundation's Behavioral Services clinic, and his report indicated that Grace came for the evaluation because "OCS[ Iwanted [her] to see a psychiatrist regarding custody of [her] child." Grace denied having any psychiatric problems at the time, but Dr. Harvey was aware of her prior contact with Southcentral, her previous psychiatric intake, and her prior treatment "for putative delusional disorder versus paranoid schizophrenia." Dr. Harvey was also aware that Grace had "subtotally discontinued taking [prescribed] medication but hald] continued in interpersonal therapy here in the clinic for some time." Dr. Harvey was also aware of Grace's prior inpatient psychiatric hospitalization at Alaska Psychiatric Institute.
Grace made clear to Dr. Harvey that she believed she had "no need for medication intervention in terms of potential psychiatric illness at this time." Dr. Harvey concluded that although "(ilt appears that she has had significant symptoms consistent with a possible delusional disorder or possible other psychotic disorder including schizophrenia in the past" she "also makes it clear that she is not seeking medication treatment for any psychiatric disorders at the present time." Thus, Dr. Harvey indicated that he would "not schedule her for further follow[-Jup at the present time" but he "did urge her to feel free to present once again to the clinic in the future should she have a desire for further evaluation or consideration of medication intervention for psychiatric issues."
When Dr. Glass interviewed Grace about two weeks later on March 10, 2010, and again on March 16, 2010, she apparently did not have Dr. Harvey's report from his February 23, 2010 evaluation. Her report indicated that she reviewed Southcentral records through May 28, 2009 and that updated ree-ords from Southcentral Foundation had been requested but "not received."
Thus, when Dr. Glass recommended that Grace be referred to a psychiatrist for a medication review, she was unaware that Grace had just had such a review. And Dr. Glass's assessment in her March 2010 report that Grace was "unlikely" to take medication to improve her ability to discern what is real from what is not was completely consistent with Grace's statement to Dr. Harvey that she was "not seeking medication treatment for any psychiatric disorders at the present time." We therefore conclude that, by the time of Dr. Mass's report, OCS had already provided active efforts to encourage Grace to obtain an appropriate medication review by a psychiatrist.
Grace also argues that OCS failed to provide active efforts because it failed to monitor or intervene in her therapy with Gustafson. But Grace's argument fails to acknowledge the social worker's testimony that OCS did keep in touch with Gustafson and monitor Grace's progress in therapy. More importantly, a review of Dr. Glass's testimony and reports suggests that Dr. Glass felt that Grace needed to be treated with kid gloves, and that any treating professional suggesting that she was delusional or required medication stood the chance of driving her away and destroying any chanee for a beneficial, therapeutic relationship.
Dr. Glass's initial reports concluded that "Mr. Gustafson is likely the key to enlisting her cooperation in treatment but there is the chanee that if he becomes involved in a push to get her on medication and become more involved with mental health treatment she will incorporate him into her delusional system and cut off the relationship." She also opined that "[mJental health therapy would *987 need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying trauma, and addressing her delusional system." But Dr. Glass ultimately concluded that these efforts would be futile: "It is unlikely [Grace] will cooperate with this plan in any significant fashion, yet if she does not she is unlikely to be able to appropriately and safely parent her son."
The superior court concluded that OCS was not required to "have intervened in the counseling and re-directed Mr. Gustafson to ensure that counseling focused on the appropriate issues [relating to Grace's delusions]" because Gustafson
"didn't think it was a priority and the department legitimately relied on his opinion of what is going on and his work with [Grace]. This was a counselor that was free for [Grace], easy to get to, and most importantly [Grace] trusted [Gustafson] and had worked with him for years. This was an important relationship for [Grace]. Dr. Glas[s] testified [Grace's] delusional issues are fixed and permanent, so ameliorating them so she can function well [in] a day to day environment may well be the best that can be done."
These conclusions appear to be well supported.
Based on this record, the superior court reasonably concluded that OCS made active efforts to preserve this family, even though these efforts ultimately proved unsuccessful.
C. The Superior Court Did Not Err When It Concluded That Termination of Grace's Parental Rights Was In Ronnie's Best Interests.
Before a superior court may terminate parental rights it must also find that termination is in the best interests of the child.[14] The superior court made that finding here, based on Ronnie's need for a permanent living situation and a permanent family.
Grace argues that the superior court did not adequately explore the option of a guardianship for Ronnie. But the superior court explicitly rejected guardianship as a perma-neney option, stating that
I gave serious thought to a guardianship approach. Because that would allow ongoing contact between [Ronnie] and his mom. But as the guardian ad litem pointed out, [Ronnie] needs a permanent living situation.... He needs to be done with this, he needs to know what the plan is until he turns 18. And a guardianship would not provide that sense of permanency ... it can be undone and ... I don't think things are going to change with [Grace] significantly in the next five or six years.
The superior court's conclusion is consistent with our case law.
The law does not require the superi- or court to consider a guardianship in the context of a termination proceeding, except to the extent that the statute requires the court to consider the child's best interests.[15] The court may reasonably reject a request for guardianship if such a plan would be inconsistent with a child's need for stability and protection.[16] Here the superior court determined that Ronnie's best interests favor termination. This was a reasonable conclusion based on the record at trial. -
Grace also argues that the superior court erred in finding that termination was in Ronnie's best interests because termination would not allow Grace to have ongoing contact with Ronnie, and that ongoing contact would be in Ronnie's best interests. As noted above, the superior court clearly considered this factor when it decided that termination was in Ronnie's best interests. But the court also noted: "It is very unfortunate ... to me that the current law does not allow a judge to order termination but also order ongoing contact,. I really wish I had that option, because I would certainly order it here, but I don't have that option."
We have previously stated that superior courts probably lack authority to order post- *988 termination visitation by biological parents because the CINA statute does not provide for the parents to retain any such residual rights.[17] In that case, we relied on a decision interpreting the adoption statute, which reasoned that because the adoption statute did not mention post-adoption visitation, the statute foreclosed superior courts from issuing orders requiring post-adoption visitation.[18] But we have also suggested that in cases involving "extraordinary circumstances" superior courts may have authority to order post-termination visitation to the extent that such contact will serve the child's best interests.[19]
In this case, Grace did not specifically ask the court to allow visitation following the termination of parental rights, so we do not consider that issue directly.[20] Indeed, the superior court explicitly considered the value of continuing contact between Grace and Ronnie as a factor weighing against termination. But the court ultimately determined to order termination to promote Ronnie's needs for stability and protection. The superior court did not commit any clear error when it balanced these factors and reached its final conclusion that termination would be in Ronnie's best interests.
E. The Superior Court Properly Considered Grace's Claim Of Ineffective Assistance Of Counsel.
Grace argues that her appointed attorney provided ineffective assistance of counsel.[21] She raised this issue in the superior court by making three requests for substitution of counsel. The superior court held a hearing on each request and denied Grace's motions.
The superior court also denied Grace's request to have another judge consider her challenges:
[The fact that [Grace] makes allegations, the fact that she behaves the way she does has no bearing whatsoever on my rulings.... I'm going to rule on [the petition] based on the record I have at the trial.... It is a necessary part of a judge's life that they address people who want to replace their lawyers, and the judge who's the trial judge is in the best position to figure out what the problem is, because they [understand the] context.
On appeal, Grace argues broadly that to avoid an appearance of impropriety the superior court should have appointed another judge to hear her requests for substitution of counsel.[22] She argues that during the representation hearing she could "have revealed mental infirmities or said something that could negatively affect the trier of fact's view of her." But Grace does not cite any cases supporting this view or argue how the procedure in this case created an appearance of impropriety.
In Alaska, a judge has an obligation not to order disqualification "when there is no occasion to do so."[23] Trial judges are often called upon to compartmentalize their decisions-to review evidence that is later declared to be inadmissable or to rule on similar legal issues at different stages of a contested case. Generally, these decisions do not create an appearance of impropriety *989 unless the judge hears something or does something so prejudicial that further participation would be unfair to the parties.[24]
In this case, Grace not only fails to identify any legal error; she also fails to show any way that the consideration of her requests for substitution of counsel by the assigned judge affected the ultimate decision in this case. Thus Grace has failed to show any error that would require us to reverse the superior court's decision on her request for assignment of a different judge.[25] And Grace does not raise any other arguments regarding the superior court's decision denying her requests for substitution of counsel.
Grace also challenges several decisions by her trial counsel: she argues that her counsel failed to zealously assert that OCS did not make active efforts on her behalf, failed to pursue the issue of guardianship, and failed to pursue the question of future contact between her and Ronnie. These decisions all appear to involve tactical considerations that are resistant to subsequent challenge.[26] But Grace did not present these arguments to the superior court, so we have no superior court order to review directly.[27] And the record contains no explanation of her attorney's decisions that would assist our review.[28] We conclude that the superior court did not commit plain error in its failure to recognize or resolve these challenges.[29]
v. CONCLUSION
For the foregoing reasons, we AFFIRM the superior court's order terminating Grace's parental rights to Ronnie.
STOWERS, Justice, dissenting.

. - Pseudonyms are used throughout to protect the family's privacy.

. Grace and Ronald, Ronnie's father, later stipulated to Ronnie's adjudication as a child in need of aid. Ronald lived in a community far from Grace and Ronnie. Ronald later relinquished his parental rights to Ronnie.

. Gustafson later testified at the termination trial that he worked with Grace to enhance her ability to function in the world, but that he did not attempt to ameliorate her underlying delusions.

. Sherman B. v. State, Dep't of Health & Soc. Servs., 290 P.3d 421, 427 (Alaska 2012) (citing Christina J. v. State, Dep't of Health & Soc. Servs., 254 P.3d 1095, 1103 (Alaska 2011)).

. Id. at 428 (citing Christina J., 254 P.3d at 1104).

. Philip J. v. State, Dep't of Health & Soc. Servs., 314 P.3d 518, 526-27 (Alaska 2013) (quoting Pravat P. v. State, Dep't of Health & Soc. Servs., 249 P.3d 264, 269-70 (Alaska 2011)).

. Christina J., 254 P.3d at 1104 (citing Ben M. v. State, Dep't of Health & Soc. Servs., 204 P.3d 1013, 1018 (Alaska 2009)).

. Griswold v. Homer City Council, 310 P.3d 938, 941 (Alaska 2013).

. AS 47.10.088(a)(1) & (2).

. 25 U.S.C. § 1912(F) (2012).

. AS 47.10.011(11) provides that "the court may find a child to be a child in need of aid" if *985 "the parent ... has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury(.}"

. "[Plarentification in the family entails a functional and/or emotional role reversal in which the child sacrifices his or her own needs for attention, comfort, and guidance in order to accommodate and care for logistical or emotional needs of the parent." Nancy D. Chase, Parentifi-cation: An Overview of Theory, Research, and Societal Issues, in Burpenep Cuinoren: Turory, ResEarcH AND TreatmENT or ParEntirication 3, 5 (Nancy D. Chase ed., 1999).

. 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

. AS 47.10.088(c).

. Thea G. v. State, Dep't of Health & Soc. Servs., 291 P.3d 957, 968 (Alaska 2013).

. See Doug Y. v. State, Dep't of Health & Soc. Servs., 243 P.3d 217, 230 (Alaska 2010).

. C.W. v. State, Dep't of Health & Soc. Servs., 23 P.3d 52, 57-58 (Alaska 2001).

. See id. (citing In re W.E.G., 710 P.2d 410, 415 (Alaska 1985)). The adoption statute was subsequently amended to specifically allow for such "open adoptions." See AS 25.23.130(c).

. - Burke P. v. State, Dep't of Health & Soc. Servs., 162 P.3d 1239, 1248 (Alaska 2007).

. See Hannah B. v. State, Dep't of Health & Soc. Servs., 289 P.3d 924, 935 (Alaska 2012) (declining to consider the question of whether a guardianship would be in a child's best interests because the issue was not raised at the termination trial).

. See VF. v. State, 666 P.2d 42, 45 (Alaska 1983) (holding that an indigent parent has a constitutional right to the effective assistance of counsel in a proceeding to terminate parental rights).

. Alaska Code of Judicial Conduct Canon 3(E)(1) provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. ..."

. Amidon v. State, 604 P.2d 575, 577 (Alaska 1979).

. See Lacher v. Lacher, 993 P.2d 413, 420-21 (Alaska 1999) (judge who had been involved in one party's involuntary commitment proceedings not disqualified from presiding over divorce trial); R.J.M. v. State, Dep't of Health & Soc. Servs., 946 P.2d 855, 869-70 (Alaska 1997) (judge who presided over parents' divorce trial not disqualified from later proceedings to terminate parental rights); Cook v. State, 36 P.3d 710, 728-29 (Alaska App.2001) (judge who issued restraining order not disqualified from plea proceedings on related stalking charge); see also State v. City of Anchorage, 513 P.2d 1104, 1112 (Alaska 1973) (approving federal rule that "a judge may not be disqualified on the mere basis of previous rulings, opinions, or exercises of judicial discretion").

. Alaska Civil Rule 61 provides in part: "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

. Chloe O. v. State, Dep't of Health & Soc. Servs., 309 P.3d 850, 858-59 (Alaska 2013) (citation omitted).

. See Wetherhorn v. Alaska Psychiatric Inst., 156 P.3d 371, 384 (Alaska 2007) (declining to review an ineffective assistance of counsel claim that was not raised in the superior court).

. -See Nelson v. State, 273 P.3d 608, 612 (Alaska 2012) (requiring a challenging party to present some evidence ruling out the possibility of a tactical reason explaining an attorney's conduct).

. See Paula E. v. State, Dep't of Health & Soc. Servs., 276 P.3d 422, 436 (Alaska 2012) (reviewing for plain error an objection that was not raised in the superior court).