NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TIM B., | ) | |
| | ) | Supreme Court No. S-17372 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-16-00173 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | No. 1752 – December 18, 2019 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: J. Adam Bartlett, Law Office of J. Adam Bartlett, Anchorage, for Appellant. Anna R. Jay, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A father appeals the termination of his parental rights, arguing that the superior court erred when it found that the Office of Children's Services (OCS) made active efforts to reunite him with his daughter, who is an Indian child as defined by the Indian Child Welfare Act (ICWA). He claims that OCS did not make active efforts

_____

[*] Entered under Alaska Appellate Rule 214.

because it did not provide him more effective individual therapy after he failed to make progress for a year. Because the superior court did not err, we affirm the termination of parental rights.

## II.     FACTS AND PROCEEDINGS

Tim B. is the father of Laura,[1] an Indian child[2] born in October 2016. OCS took emergency custody of Laura two days after she was born due to concerns about her mother's drug use and domestic violence between her parents. In November OCS placed Laura with a paternal great-aunt who has remained her foster parent. The superior court terminated Laura's mother's parental rights in June 2018; she did not appeal.

### A.     First Termination Trial

OCS filed a petition for termination of Tim's parental rights in April 2017 alleging that Laura was a child in need of aid under AS 47.10.011(1) (abandonment), (6) (physical harm), (8) (mental injury), (9) (neglect), and (10) (substance abuse). In its pretrial memorandum OCS also asserted Tim's mental illness as an additional basis under AS 47.10.011(11).[3]

---

[1]     We use pseudonyms to protect the privacy of the family.

[2]     *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."). Laura's tribal affiliation is with the Native Village of Stevens because her mother is a tribal member.

[3]     Alaska Statute 47.10.011(11) allows a court to find a child to be in need of aid if it finds "that the child has been subjected to any of the following . . . [including] the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."

Over four days of trial in July and August 2017, OCS presented five witnesses, including Dr. Martha Cranor, whom it called as an expert in psychology. Dr. Cranor testified about her interview with Tim and the results of the psychological evaluation and parental risk assessment she had conducted. She concluded that Tim was emotionally stunted as a result of the neglect he suffered as a child. She testified further that she had "a number of concerns" regarding his ability to care for and protect Laura. Dr. Cranor declined to recommend any specific treatment for Tim because of her opinion that his "prognosis for significant meaningful change in a reasonable period of time was poor," but she did recommend that Tim have "as many opportunities as he could to visit with his daughter, and that he be provided with some very practical kinds of parenting education."

At the conclusion of trial the superior court took the matter under advisement. The court later issued a written decision finding by clear and convincing evidence that Laura was a child in need of aid under AS 47.10.011(11) because Tim had "a mental deficiency or serious emotional disturbance . . . that place[d] [Laura] at substantial risk of physical harm or mental injury." The court noted that the assigned OCS worker's efforts "would be considered . . . active efforts if the domestic violence and substance abuse bases of AS 47.10.011 had been established at trial." However, citing *Kylie L. v. State, Department of Health & Social Services*,[4] the superior court found that OCS failed to engage in active efforts to "remedy[] the condition[] that led to finding the child in need of aid," which was Tim's mental health. Because OCS did not provide the services recommended by its expert — "frequent visitation and concrete instructions in infant care" — the court found that OCS had not made active efforts to reunite Tim with Laura. The court therefore denied OCS's petition to terminate Tim's

_____

[4]     407 P.3d 442, 448-49 (Alaska 2017).

parental rights and temporarily extended its custody of Laura pending a further hearing. Tim and OCS later stipulated to extend OCS custody by one year, to February 2019.

### B.    Active Efforts Hearing

One month after the court denied OCS's petition to terminate Tim's parental rights, OCS requested an evidentiary hearing to determine whether it had made active efforts since the trial. OCS presented two witnesses at the ensuing March 2018 evidentiary hearing: the assigned OCS caseworker and Tim's case manager at Restore, Inc., a nonprofit agency that provides parenting education and a variety of services to families.

The caseworker testified that OCS was providing twice-weekly supervised visitation between Tim and Laura. The caseworker had referred Tim for individual counseling with a specific therapist. But after discovering that Tim had begun working with another therapist, Elizabeth Sewell, the caseworker agreed to pay for Tim's counseling. The caseworker also referred Tim to the Resource Center for Parents and Children (RCPC) for parenting classes and, as she had done with the therapy, later agreed to pay for parenting classes at Restore when she learned he was attending classes there. Tim's case manager at Restore testified that Tim was enrolled in parenting classes from late August to mid-December 2017, when he stopped attending. She stated that his attendance was "sporadic" and that he failed to make progress when he did attend. Tim did not call any witnesses.

At the conclusion of the hearing the superior court found that OCS had made active efforts from September 2017 through the date of the hearing to provide the services recommended by Dr. Cranor.

### C.    Second Termination Trial

In June 2018 OCS filed an amended termination petition alleging that Tim "ha[d] not demonstrated any changes in regards to his mental health and overall life

stability since [Laura] was born." The second trial was held in November and December. Dr. Cranor again testified as an expert. She had conducted an updated psychological evaluation and parental risk assessment and reached the same conclusions as she had previously: that Tim's "risk for future child abuse and neglect remains high given his poor response to interventions to date."

The caseworker again testified. She detailed OCS's efforts since the first trial. As she had explained at the active efforts hearing, OCS had agreed to pay for the therapist Tim had chosen in place of the one it had recommended. The caseworker explained that OCS had done so in the hope that Tim would be more likely to participate in and benefit from therapy with a counselor he had chosen. She also testified that she met with Tim frequently to confirm he was working on his case plan and to learn whether he was making progress; he told her at almost every meeting that he was benefitting from the counseling. Because Tim consistently reported a positive relationship with Sewell, the caseworker "didn't see the need to find a different counselor for him."

OCS called Sewell as a witness to describe the therapy that she provided to Tim. Sewell testified that they had about 40 individual sessions of cognitive behavioral therapy in the last year and that her goal in cognitive behavioral therapy was "to help [clients] recognize how their thinking affects their behavior." She stated that she worked with Tim on concrete goals such as housing, employment, and hygiene, as well as broader concepts such as increasing insight and decreasing defensiveness. Sewell also testified that she spoke with the caseworker approximately monthly, reporting that,

despite regular attendance, Tim was not making progress because outside their sessions he was not applying what he learned in therapy.[5]

After OCS rested, Tim called psychologist Dr. David Truhn as an expert witness. Dr. Truhn testified based on his own tests and interview with Tim as well as additional information from OCS. Dr. Truhn diagnosed Tim with post-traumatic stress disorder (PTSD) in partial remission and depressive disorder. Dr. Truhn recommended that Tim receive individual therapy with a therapist trained in treating PTSD symptoms. Dr. Truhn stated that it was crucial for Tim and his therapist to develop a trusting relationship and for him to feel that he was in a safe environment. Once that was established Dr. Truhn believed Tim would need "very hands-on cognitive behavioral work" applied to day-to-day situations and therapy to replace irrational thought processes with rational ones. Dr. Truhn believed that Tim would not be able to work on any childhood or long-term issues until this basic work was done.

Dr. Truhn concluded that Sewell was not providing the most effective type of therapy for Tim. Dr. Truhn was concerned that Tim had referred to Sewell as an advocate rather than a therapist. Based on reviewing Sewell's deposition testimony and interviewing Tim, Dr. Truhn believed Tim's lack of progress could be due to Sewell's failure to provide the correct type of therapy. Dr. Truhn stated that a person receiving cognitive behavioral therapy could make "some real significant progress" in three to six months. He attributed Tim's failure to unknown "variables" and questioned whether there was a problem with the therapist.

---

[5] Sewell testified at her deposition that "[p]articipation doesn't always mean progress."

**D.     Superior Court's Decision**

At the close of the second termination trial, the court informed the parties that it would review the evidence and issue a written decision. The court issued a detailed, 75-page written decision that reviewed the evidence provided at all three hearings. The superior court found by clear and convincing evidence that Laura was a child in need of aid, that Tim failed to remedy the conduct or conditions placing her at risk, and that OCS had made active efforts to prevent the breakup of their family.[6] The court found beyond a reasonable doubt that placing Laura with Tim was likely to result in serious emotional damage to her.[7] The court also found by a preponderance of the evidence that termination of Tim's parental rights was in Laura's best interests.[8] Tim appeals only the superior court's active efforts finding.

---

[6]     *See Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 209 (Alaska 2010) ("Before a court may terminate the parental rights of an Indian child under ICWA and Alaska's Child in Need of Aid (CINA) statutes and rules, OCS must prove five elements under various evidentiary standards. [The first three] OCS must prove by clear and convincing evidence: (1) that the child is 'in need of aid' under AS 47.10.011; (2) that the parent failed, within a reasonable time, to remedy the conduct or conditions in the home such that returning the child would place the child at substantial risk of physical or mental injury; and (3) that OCS made active efforts to provide remedial services designed to prevent the breakup of the Indian family." (citations omitted)).

[7]     *See id.* (In addition to the three listed above, "OCS also must prove by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child." (citations omitted)).

[8]     *See id.* (Finally, "OCS must prove by a preponderance of the evidence . . . that termination of parental rights is in the best interests of the child." (citations omitted)).

### 1.     Active efforts

The court's written analysis of OCS's efforts to reunite Laura and Tim covered eleven pages and examined the efforts made in four distinct periods over the two years that the case had been pending. The court focused on what OCS had done to implement Dr. Cranor's specific recommendations for frequent visitation, hands-on parenting education, and individual therapy.

The court first analyzed OCS's efforts from its emergency custody of Laura in October 2016 to February 2017. The court found that OCS had provided twice-weekly opportunities for Tim to visit Laura but that he missed a number of them. The court also found that OCS had referred Tim to individual counseling but that he had not attended it. Finally, the court found that OCS failed to provide Tim any parenting education. The court then cited *Christina J. v. State, Department of Health & Soc. Services, Office of Children's Services*[9] and held that Tim's delay in engaging in the services offered to him mitigated OCS's responsibility. After considering OCS's efforts and Tim's reluctance to work with OCS, the court found that between October 2016 and February 2017 OCS had satisfied its active efforts requirement.

The court next considered the period from the adjudication hearing in February 2017 until September 2017 when OCS began providing the services Dr. Cranor recommended. The court reiterated its original trial finding that OCS had failed to make active efforts during this time. The court found that OCS had allowed the foster parent to take Laura outside of Alaska for two months and that it had not arranged any visitation with Tim during that time. Furthermore, OCS did not provide him any parenting education until September 2017. And the court found that although OCS continued to refer Tim for individual counseling, he did not follow up on the referral.

---

[9]     254 P.3d 1095, 1108 (Alaska 2011).

The court then turned to the period from September 2017 through the active efforts hearing in March 2018. The court referred back to its finding from the hearing that active efforts had begun in September 2017 and continued through the hearing date. It then noted that "no further review of active efforts during the September 2017 to March 2018 period is required." The court reiterated that OCS had "engaged in active efforts to help [Tim] remedy the mental health concerns that place [Laura] at substantial risk of mental injury from September 1, 2017 to March 28, 2018."

The court next considered the time since the active efforts hearing. It first looked to whether OCS had provided Tim the recommended hands-on parenting education. The court noted that after the first termination trial concluded in August 2017, OCS had paid for Tim to attend Restore's parenting classes from September through December. Although Restore's classes did not include supervised visitation with Laura, they did provide one-on-one instruction for Tim. OCS also referred Tim to RCPC in February 2018 for hands-on parenting education during supervised visits with Laura. Tim participated in RCPC's program from March until he was discharged in August.

The court then examined whether OCS had provided frequent visitation. After reviewing the visits included as part of RCPC's parenting classes, the court looked to the visits that were provided after Tim was discharged from the program. The court found that from August until the trial date, Tim had supervised visits twice weekly at OCS. And OCS arranged for the therapist working with Laura to attend Tim's visits and provide one-on-one instruction to help him learn to properly care for Laura. Finally, the court also found that OCS had authorized visits between Tim and Laura when the foster parents were available to supervise.

The court next turned to the recommendation for individual therapy. It found that the OCS caseworker had confirmed that Tim was still seeing Sewell and had regularly asked him about his therapy. The court cited the caseworker's testimony that

Tim stated at almost every meeting that he believed he was getting a lot out of his sessions with Sewell. The court concluded that by accepting Tim's choice of therapist and monitoring his participation and progress, "OCS engaged in active efforts designed to remedy the mental health issues [Tim] experiences that present a substantial risk of mental injury to [Laura]."

The court concluded that, based on the evidence showing OCS had provided all of the services recommended by both Dr. Cranor and Dr. Truhn, OCS had made active efforts since March 2018.

After reviewing the efforts provided in each of the four periods it had identified, the court then "assessed [OCS's efforts] as a whole over the life of [the] case." Noting that the efforts "need not be perfect" and citing *Christina J.*,[10] the court found that despite a lapse in active efforts from February to September 2017, "OCS's efforts to help [Tim] remedy his mental health issues have been active when viewed over the life of the case."

### 2. Termination decision

The superior court then considered whether OCS's active efforts had been successful in preventing the break up of the family. The court found, based on Sewell's testimony, that for more than a year Sewell had provided the type of "rudimentary cognitive behavioral therapy work" Dr. Truhn had recommended, "but contrary to Dr. Truhn's prognosis, [it had] not borne fruit." The court instead found that Dr. Cranor's prediction that Tim was unlikely to be able to make meaningful significant change had been proven. Despite the services that OCS had provided, Tim "ha[d] been proven to be incapable of improving the mental health-related behaviors that have caused mental injury to [Laura]," and the court therefore found "beyond [a] reasonable doubt

---

[10] *Id.*

that placing [Laura] with [Tim would] place her at substantial risk of mental injury." The court then found that termination of Tim's parental rights was in Laura's best interests.

Tim appeals the court's order terminating his parental rights, arguing that OCS failed to make active efforts to address his mental health.

## III. STANDARD OF REVIEW

"Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact."[11] "We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[12] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[13]

## IV. DISCUSSION

Before a court may terminate parental rights to an Indian child, it must find by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[14] Whether OCS's efforts qualify as

---

[11] *Sam M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[12] *Id.* (quoting *Philip J.*, 314 P.3d at 526).

[13] *Id.* (quoting *Philip J.*, 314 P.3d at 526-27) (alterations omitted).

[14] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting 25 U.S.C. § 1912(d) (2006) and CINA Rule 18(c)(2)(B)).

active is determined on a case-by-case basis.[15]  Efforts are passive when the agency caseworker draws up a case plan and leaves the parent to follow through on the plan.[16] On the other hand, active efforts are made when the caseworker "takes the client through the steps of the plan."[17]  "[T]he active efforts requirement does not require perfection," but rather ensures that OCS's efforts "cross[] the threshold between passive and active efforts."[18]  The recently adopted Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[19]

In the superior court's lengthy and detailed written termination order, the court carefully documented OCS's efforts and determined that those efforts were active. The court found that, except for the two months when Laura was outside Alaska with her foster family and OCS failed to arrange visitation with Tim, OCS had provided the frequent supervised visits that Dr. Cranor and Dr. Truhn recommended.  The court described the hands-on, one-on-one parenting education provided to Tim by multiple agencies beginning in September 2017.  And the court found that OCS supported Tim's choice to begin therapy with Sewell by paying for the counseling and frequently following up with both Tim and Sewell.  The court determined that OCS had not made

---

[15]     *Id.* (citing *Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008)).

[16]     *Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 214 P.3d 284, 293 (Alaska 2009) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[17]     *Id.* (quoting *A.A.*, 982 P.2d at 261).

[18]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) (citing *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 218 (Alaska 2010)).

[19]     25 C.F.R. § 23.2 (2019).

active efforts to address Tim's mental health needs early in the case and had denied OCS's first termination petition for that reason. But the court determined that OCS had corrected its failure and that, over the entire time Laura was in its custody, its efforts to reunify her with Tim were active.

Tim now appeals, urging us to hold that OCS had "a duty to re-evaluate the efforts provided and try another course of action" because he did not make progress in therapy. OCS has no such duty. OCS's duty is to provide case-specific "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with . . . her family."[20] It did so here.

Dr. Truhn, the expert psychologist whom Tim presented at trial, testified that Tim needed individual cognitive behavioral therapy. OCS referred Tim to a therapist who would provide that type of therapy, but Tim instead selected a different one. OCS then approved of his chosen counselor — who the court found was providing cognitive behavioral therapy — and paid for over a year of therapy with her. The caseworker monitored Tim's participation and progress in therapy, and neither Tim nor Sewell expressed concern or dissatisfaction with it. Tim consistently participated in therapy and reported to the caseworker that he was "getting a lot" out of the counseling. The counselor informed the caseworker that although Tim was attending therapy, he was not improving because he was not doing the necessary work.

We have repeatedly held that OCS may defer to the expertise of the professionals providing services to parents. In *Grace L. v. State, Department of Health & Social Services, Office of Children's Services* we explicitly rejected the argument that "OCS failed to provide active efforts because it failed to monitor or intervene in [the

---

[20]    *Id.*

parent's] therapy."[21]  There OCS relied on the therapist's report on the parent's progress and substance of the therapy.[22]  In the same vein, we have held that OCS made active efforts when it relied upon an inpatient treatment program to provide a variety of mental health and substance abuse services to a parent.[23]  And we rejected as "superfluous" any additional efforts OCS's predecessor could have made while an incarcerated parent was receiving therapeutic services from the Department of Corrections.[24]

Tim's lack of improvement after a year of therapy was not proof that OCS needed to "try another course of action" but rather that, as Sewell stated, "[p]articipation does not always mean progress."  OCS was entitled to defer to Sewell's expertise when she reported that Tim's lack of progress was due to his lack of commitment to the therapy rather than to any failure of the therapy being provided.

This was not a case in which "a plan was drawn up and the parent was left to his own devices in carrying it out."[25]  It was a case in which OCS accommodated the parent's choice of counselor in the therapy recommended by two experts and closely monitored his progress.  The superior court did not err in finding that OCS provided active efforts to help Tim remedy his mental health issues.[26]

---

[21]     329 P.3d 980, 986-87 (Alaska 2014).

[22]     *Id.*

[23]     *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 656 (Alaska 2017).

[24]     *See A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997).

[25]     *See Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) (citation omitted).

[26]     To the extent that Tim argues that OCS should have given him more time to work with a different therapist, we reiterate the importance of permanency for a young
(continued...)

## V. CONCLUSION

Because the superior court did not err by finding that OCS made active efforts, we AFFIRM the termination of parental rights.

---

**26** (...continued)
child who has been in custody since her birth. *See, e.g.*, *Denny M. v. State, Dep't of Health & Soc. Servs.*, 365 P.3d 345, 351 (Alaska 2016) ("[A] child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."); *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1263 (Alaska 2010) (weighing the particular need for permanency among young children).