*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CAITLYN E., | ) | |
| | ) | Supreme Court No. S-16306 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 4BE-13-00001/ |
| v. | ) | 00002 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7181 – June 16, 2017 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Dwayne W. McConnell, Judge.

Appearances: William T. Montgomery, Assistant Public Advocate, Bethel, and Richard Allen, Public Advocate, Anchorage, for Appellant. Joanne M. Grace, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I. INTRODUCTION

The superior court terminated a mother's parental rights to two of her Indian children. She now appeals, contesting the qualification of the ICWA-required

expert witness and the finding that OCS made active efforts to prevent the breakup of the Indian family. Because the superior court's decision to qualify the expert witness was not an abuse of discretion, and because the superior court's active efforts finding was not erroneous, we affirm the termination of the mother's parental rights.

## II. FACTS AND PROCEEDINGS

Caitlyn E., a Yupik woman, lives in Bethel and is the mother of Maggie and Bridget, ages nine and six at trial, who are Indian children within the meaning of the Indian Child Welfare Act (ICWA) based on their affiliation with the Orutsararmiut Native Council (the Tribe).[1] Caitlyn has struggled with abuse of both legal and illegal drugs since a young age. She regularly sought narcotics for back pain, and Maggie tested positive for cocaine and marijuana when she was born. The Office of Children's Services (OCS) received other reports of harm; at a doctor's visit when the girls were toddlers, they reportedly had multiple impetigo sores on their bodies and had to be cleaned by the doctor, and Caitlyn smelled like marijuana. Caitlyn was also reported to have been violent toward both her daughters, kicking Maggie and giving her a bloody nose, and, while drunk, swinging Bridget around "like a rag doll."

OCS took emergency custody of Maggie and Bridget in January 2013 after receiving reports that Caitlyn exposed Maggie to marijuana and, while intoxicated, took Maggie from the safety of Caitlyn's mother's home and allowed her to be driven by a drunk driver. The children were placed with Caitlyn's mother, Sarah, who qualified as

---

[1] *See* 25 U.S.C. § 1903(4) (2012). We use pseudonyms to protect the privacy of the parties. The father relinquished his rights before trial.

a preferred placement under ICWA.² In the ensuing months, OCS worked extensively with Sarah, helping get the family into better housing and obtain fuel oil and funding for additional food.

Caitlyn initially participated in the case, but disengaged before long. She apparently dropped out of contact with both OCS and her attorney until August 2013, when she renewed her interest in parenting after initially consenting to allow Sarah to adopt the children but later withdrawing that consent. During the spring of 2013, Caitlyn was also diagnosed with active tuberculosis for which she refused treatment.

Although Caitlyn reengaged in services in August and later obtained a substance abuse assessment, she was unable to start treatment due to her tuberculosis; no treatment center would accept her while she had active tuberculosis. In June 2014, a few days after finishing her tuberculosis medication, Caitlyn entered treatment at Phillips Ayagnirvik Treatment Center (PATC) in Bethel, but she was discharged after less than two weeks for possession of marijuana and unprescribed pills. PATC then recommended a higher level of care, but instead Caitlyn proceeded to, in her own words, "drink[] for three months straight."

In November 2014 Caitlyn began treatment at Women and Children's Center for Inner Healing in Fairbanks. OCS completed her application, provided transportation for her, and sent Bridget to join her within 30 days as required by the program. OCS also made arrangements for Maggie to visit. Because Caitlyn initially did well at Women and Children's Center, OCS decided to hold a termination petition in abeyance in January 2015. But Caitlyn was discharged in March for throwing a frozen water bottle at a staff member. Sarah later testified that the sudden removal of Caitlyn

---

²       *See* 25 U.S.C. § 1915(b) (giving preference to "a member of the Indian child's extended family").

and Bridget from the facility when Bridget had been sleeping made Bridget become withdrawn and scared.

Following Caitlyn's discharge from Women and Children's Center, OCS worked with her to try to get her back into treatment, completing applications to three different facilities on her behalf. Caitlyn agreed to submit to urinalysis tests (UAs) and was given cab vouchers for transportation to her appointments, but she completed no UAs. In September 2015 Caitlyn completed an integrated intake assessment for substance abuse treatment, at which she stated she used drugs on a daily basis and craved heroin. Multiple therapies and inpatient residential treatment were recommended.

But the following month, Caitlyn again dropped out of contact with OCS. Her caseworker continued to leave messages for her, but she did not respond until February 2016. During that time Caitlyn had been working on her own — without the knowledge or support of OCS — to get re-accepted to Women and Children's Center and had secured a bed date. Caitlyn filed a motion for a review hearing under Alaska Child in Need of Aid (CINA) Rule 19.1(d),[3] asking the court to order OCS to place Bridget with her at Women and Children's Center within 30 days, as required by the program. The court held a hearing on her motion two weeks before the termination trial. OCS opposed Caitlyn's request, explaining that when Caitlyn had been discharged for misconduct, Bridget was traumatized by being suddenly removed along with her mother. OCS stated it was unwilling to risk the same result a second time. The superior court declined to order OCS to place Bridget at Women and Children's Center.

---

[3]      "At any time in a proceeding, the court may review matters not otherwise covered by these rules upon motion of a party or on its own motion." CINA Rule 19.1(d).

A joint permanency hearing and termination of parental rights trial was held over four days in February 2016.[4] Five witnesses testified: Caitlyn; Sarah; two OCS caseworkers, Collyn Symmes and Karen Johnson; and ICWA expert Robin Charlie, a Yupik woman with six years of experience doing social services work for the Tribe. The children's guardian ad litem (GAL) and the Tribe also participated.

Caitlyn testified that she had been sober for 15 months, and she felt her children were safe around her even when she was drinking as long as a sober person was present. She stated that she smokes marijuana "whenever [she] feel[s] like it" and had done so as recently as the day before trial. Her testimony revealed that she chose not to attend UAs. She blamed OCS for interfering with her recovery by switching caseworkers so frequently and for Bridget's traumatizing removal from Women and Children's Center.

Sarah testified that Caitlyn only intermittently visited her daughters, stating that when she visited in a bad mood, she yelled at Sarah in front of the girls and frightened them. Sarah also testified that Bridget was "a changed little girl" who acted "withdrawn" and "scared" following Caitlyn's and Bridget's discharge from Women and Children's Center. Sarah further testified that at least two OCS caseworkers had made themselves available to her by phone to help her through verbal confrontations with Caitlyn.

The OCS caseworkers testified regarding efforts they made to get services for Caitlyn and her family, and their difficulty reaching her or securing her cooperation. Symmes testified that he helped get the family into better housing and obtain fuel oil and additional funding for food. OCS lost part of Caitlyn's file while Symmes was assigned

---

[4]     The proceeding was continued twice, after being originally scheduled for August and then December 2015.

to her case, but he testified that Caitlyn could not have been in treatment during that period because she had active tuberculosis. Johnson testified that, after working with Caitlyn to apply to treatment programs, Caitlyn fell out of contact with OCS in the months leading up to the termination trial.

The superior court qualified Charlie as an expert in Yupik child-rearing practices and child protection over Caitlyn's objection that Charlie lacked social work education and substance abuse expertise. Charlie testified that it was her expert opinion that the children would be at risk of harm if returned to Caitlyn's custody because of her substance abuse and verbal abuse. Charlie explained that substance use in front of children and verbal abuse of family are not normal parts of Yupik culture. On cross-examination Charlie conceded that Women and Children's Center would benefit Caitlyn. She also acknowledged that a delay in permanency would not change the children's situation, as they would be placed with Sarah whether or not Caitlyn's parental rights were terminated and they were old enough to know they were living with their grandmother.

In order to terminate parental rights to an Indian child, the superior court must make five factual findings.[5] Here, the parties stipulated to the first two findings: that Maggie and Bridget were children in need of aid under AS 47.10.011(6) (physical harm), (9) (neglect), and (10) (substance abuse) and that Caitlyn had failed to remedy the conduct placing them in need of aid. In addition the court made three oral and written findings: (1) by clear and convincing evidence that OCS made active efforts to prevent the breakup of the Indian family;[6] (2) by a preponderance of the evidence that

---

[5]  *See, e.g.*, *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014).

[6]  Caitlyn argues that the superior court failed to make this finding by clear
(continued...)

termination is in the best interests of the children; and (3) beyond a reasonable doubt that continued custody of the children by Caitlyn is likely to result in serious emotional or physical damage to them. Accordingly, the superior court terminated Caitlyn's parental rights to Maggie and Bridget.

Caitlyn now appeals, arguing that Charlie should not have been qualified as an expert witness and that OCS did not make active efforts to prevent the breakup of the Indian family.

## III. DISCUSSION

### A. The Superior Court Properly Qualified Robin Charlie As An Expert Witness Under ICWA.

ICWA requires that the likelihood of harm finding be supported by the testimony of a qualified expert witness.[7] Caitlyn argues that Charlie, OCS's sole expert witness, did not possess "expertise beyond the normal social worker qualifications"[8] — specifically any expertise in the area of substance abuse — and as such should not have been allowed to give an opinion regarding substance abuse. We review the superior court's decision to admit expert testimony for abuse of discretion,[9] and we review

---

[6] (...continued) and convincing evidence as required by CINA Rule 18(c)(2)(B). After oral argument to us, the superior court clarified that it used the appropriate standard to make its finding, so we do not address this argument further.

[7] 25 U.S.C. § 1912(f).

[8] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (quoting H.R. REP. NO. 95-1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545).

[9] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

de novo whether that expert testimony satisfies the requirements of ICWA.[10] We conclude that the superior court properly qualified Charlie as an expert witness and properly relied on her testimony to support ICWA's likelihood of harm finding.

The superior court qualified Charlie under the 2015 Bureau of Indian Affairs (BIA) Guidelines.[11] Those guidelines explain that "[a] qualified expert witness should have specific knowledge of the Indian tribe's culture and customs" and list "in descending order" four categories of persons "presumed to meet the requirements."[12] Unlike the earlier 1979 BIA Guidelines, all four of the presumptively qualified expert categories in the 2015 BIA Guidelines include knowledge of prevailing social and cultural standards or child-rearing practices within the tribe, or both.[13]

---

[10] *Id.* (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[11] ICWA does not define the term "qualified expert witness." *See* 25 U.S.C. §§ 1903, 1912(f). In the absence of a statutory definition, we have looked to legislative history and the BIA Guidelines as persuasive authority. *See Marcia V.*, 201 P.3d at 504. We note that the 2015 BIA Guidelines have since been superseded by new regulations and guidelines issued in 2016, which do not apply to this case. *See* CINA Rule 1(f); 25 C.F.R. §§ 23.101-.144 (2016); Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96,476, 96,477 (Dec. 30, 2016).

[12] Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,157 (Feb. 25, 2015) [hereinafter 2015 BIA Guidelines].

[13] *Id.* For instance, the fourth category is "[a] professional person having substantial education and experience in the area of his or her specialty *who can demonstrate knowledge* of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe." *Id.* (emphasis added). *Compare id.*, *with* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (Nov. 26, 1979) [hereinafter 1979 BIA Guidelines], (listing three categories of persons "most likely" to meet the requirements, the first two involving cultural

(continued...)

Charlie was qualified under the second category as "[a] member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe." At voir dire OCS emphasized Charlie's Yupik upbringing as a member of the Native Village of Tununak and her six years of work in social services for the Tribe in Bethel. Charlie worked with children on cultural and subsistence awareness as a youth coordinator for five years; the Tribe then promoted her to Social Services Director, and she supervised the departments for ICWA, rural child welfare, and youth services for a year and a half. The Tribe also approved Charlie's participation as an expert witness in this case. Caitlyn emphasized that Charlie was not a licensed social worker and had not yet completed all her college-level social work classes. But the 2015 BIA Guidelines do not require that a cultural expert have additional subject matter expertise,[14] and the court qualified Charlie to testify regarding how substance abuse and domestic violence affect child-rearing practices and child protection in the Tribe.

Caitlyn's argument for such a subject matter expertise requirement is based on our statement in *Marcia V.* that "more is required of an ICWA expert than simply being 'qualified' as some kind of expert under the rules of evidence."[15] But that case dealt with an expert qualified as "[a] professional person having substantial education in the area of his or her specialty," a category that did not require cultural knowledge

---

[13]     (...continued)
knowledge and the third category being "[a] professional person having substantial education and experience in the area of his or her specialty").

[14]     *See* 2015 BIA Guidelines, *supra* note 12, at 10,157.

[15]     *Marcia V.*, 201 P.3d at 504.

under the earlier guidelines.[16] Charlie was qualified as an expert based on her knowledge of the delivery of child and family services to the Tribe, not as a professional social worker or substance abuse specialist; therefore, Caitlyn's concession that Charlie is an expert in Yupik culture limits the applicability of *Marcia V*.

Furthermore, we have stated that ICWA's

[l]egislative history indicates that the primary reason for requiring qualified expert testimony in ICWA termination proceedings was to prevent courts from basing their decisions solely upon the testimony of social workers who possessed *neither* the specialized professional education *nor* the familiarity with Native culture necessary to distinguish between cultural variations in child-rearing practices and actual abuse or neglect.[17]

We concluded that "[b]ecause ICWA does not always require testimony from witnesses with *both* types of expertise, . . . so long as a termination proceeding does not implicate cultural bias, ICWA's proof requirements can be satisfied by a qualified expert witness without any special familiarity with Native cultural standards."[18]

Though the facts are reversed here, the same logic applies: Charlie has expertise in Yupik child-rearing practices and thus was able to testify without needing further "specialized professional education" that Caitlyn's substance abuse and verbal abuse were not a normal part of that culture and, combined with Caitlyn's history of aggression and verbal abuse, created a risk of harm to the children. ICWA's legislative

---

[16]    *Id.* (alteration in original) (emphasis omitted) (quoting 1979 BIA Guidelines, *supra* note 13, at 67,593).

[17]    *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 952-53 (Alaska 2000) (emphasis in original) (first citing 25 U.S.C. § 1901(5); then citing H.R. REP. NO. 95-1386, at 10-11 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7532-33).

[18]    *Id*. at 953 (emphasis in original).

history also indicates that a main concern of the law was that "social workers, ignorant of Indian cultural values and social norms, make decisions that are wholly inappropriate in the context of Indian family life."[19] This concern is reinforced by the 1979 BIA Guidelines, which provide for cultural knowledge as a separate expert category from professional expertise,[20] and the 2015 BIA Guidelines, which prioritize cultural knowledge over professional expertise.[21] Charlie's testimony addressed that concern here, ensuring that the evidence supporting the likelihood of harm finding — which properly came from both expert and non-expert sources[22] — would not be interpreted in a culturally misguided way. Specifically, Charlie noted Caitlyn's tendency to become aggressive while using substances rather than resolving conflicts in a culturally appropriate way and testified that members of Yupik tribes "don't raise our children being verbally abusive." We therefore conclude that the superior court properly admitted and used Charlie's testimony under ICWA.

---

[19] H.R. REP. NO. 95-1386, at 10, *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7532.

[20] 1979 BIA Guidelines, *supra* note 13, at 67,593.

[21] 2015 BIA Guidelines, *supra* note 12, at 10,157.

[22] Likelihood of harm "can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses." *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015) (citing *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014)). This precedent dispenses with Caitlyn's argument that Charlie improperly testified about subjects beyond her expertise. Even if Charlie's testimony regarding substance abuse and verbal abuse must be discounted, her testimony regarding Yupik culture combined with other evidence such as Sarah's testimony that Caitlyn's substance abuse hurt the family and her verbal abuse of Sarah in front of the children frightened them also supported the likelihood of harm finding.

We also note that in addition to her claim of error under ICWA, Caitlyn argues that Charlie's testimony was improperly admitted under Alaska Evidence Rule 702. Rule 702(a) provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "We confirmed long ago that 'the standard for admission of expert testimony in Alaska is whether the testimony would appreciably assist the trier of fact.' "[23] "And '[a]s a general rule, the trial judge retains wide latitude in deciding whether to admit the testimony of an expert witness.' "[24] In this case, Caitlyn argues that even if Charlie was properly qualified as an expert on Yupik child-rearing practices, the superior court abused its discretion by allowing her to offer expert testimony about "substance abuse," because, according to Caitlyn, "[s]ubstance abuse is a specialty and requires some knowledge and experience in the area."

But the superior court did not qualify Charlie to testify broadly about "substance abuse" as a general topic. Instead, the superior court qualified Charlie to testify on the more limited questions of "how substance abuse can affect the tribe" and whether substance abuse "has an effect on the child rearing practices and child protection" in the tribe. In fact, the superior court explicitly restricted the scope of Charlie's substance abuse testimony, noting that she would not be able to "giv[e] diagnoses" as to Caitlyn's substance abuse problems. We conclude that, given Charlie's knowledge and experience, the superior court did not abuse its discretion in qualifying Charlie to testify about substance abuse in the limited context we have just described.

---

[23] *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 980 (Alaska 2015) (quoting *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350 (Alaska 2012)).

[24] *Id*. (quoting *Barton*, 268 P.3d at 350).

And since Caitlyn has not pointed to any specific trial testimony that went beyond this limited context to which she objected at trial, we conclude there is no basis for reversal under Evidence Rule 702.

**B.      The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.**

Before terminating parental rights to an Indian child, a court must find that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[25]  The superior court made that finding here, acknowledging that "OCS isn't perfect" and has "certainly messed up"[26] but emphasizing that Caitlyn refused to get treatment for her tuberculosis or engage in services, was kicked out of PATC and Women and Children's Center, did not submit UAs, and fell out of contact with OCS.

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[27]  "We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[28]  "Findings are clearly erroneous if review of the entire record

---

[25]      *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009) (quoting 25 U.S.C. § 1912(d) and CINA Rule 18(c)(2)(B)).

[26]      "OCS's duty to make active efforts for a family does not require perfect efforts." *Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 478 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

[27]      *Pravat P.*, 249 P.3d at 270 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[28]      *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013) (citing *Pravat P.*, 249 P.3d at 270).

leaves us with 'a definite and firm conviction that a mistake has been made.' "[29]  Caitlyn argues that the superior court erred by finding that OCS made active efforts to prevent the breakup of the Indian family, noting several instances in which OCS either was not providing services to her or "obstructed [her] from getting the services she needed." But Caitlyn's arguments primarily consist of competing inferences, and she ignores both her own unwillingness to participate in services and OCS's efforts toward the entire family.

We have stated that "[c]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[30]  This principle disposes of four of Caitlyn's arguments.  First, Caitlyn argues that OCS failed to make active efforts when (almost a year into the case) it allegedly lost her file for six months.  Though testimony did establish that OCS lost part of the file during this time, the superior court's conclusion that this issue did not defeat active efforts was supported by testimony that Caitlyn could not be in treatment during that period because she had active tuberculosis, that no treatment center would accept her until her tuberculosis was addressed, and that OCS was able to get Caitlyn into treatment at PATC "within a matter of days" after she completed her tuberculosis medication.

Second, Caitlyn argues that OCS failed to make active efforts when it placed her at PATC even though she needed a higher level of care.  But as the superior

---

[29]     *Sherman B. v. State, Office of Children's Servs., Dep't of Health & Soc. Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[30]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (first citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004); then citing *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000)).

court noted, a caseworker testified that Caitlyn wanted to stay close to home for treatment; he also testified that starting with the "level of care that is as minimally invasive as possible" is preferable, and OCS tried to offer "the best therapeutic care we could, as close to home as possible." The superior court properly considered Caitlyn's placement at PATC as part of OCS's active efforts.

Third, Caitlyn argues that OCS failed to make active efforts when it failed to help her get back into Women and Children's Center, which Charlie, the expert witness, had testified would benefit Caitlyn.[31] But OCS had determined, and Sarah's testimony showed, that Bridget was traumatized by Caitlyn's and Bridget's previous discharge from Women and Children's Center; OCS was therefore reluctant to risk the same result a second time. The superior court could have reasonably credited OCS's position over Caitlyn's.[32]

Fourth, Caitlyn argues that OCS failed to make active efforts when it assigned her multiple caseworkers over the lifetime of the case. But Caitlyn worked closely with two caseworkers for approximately one year each and was evasive throughout other time periods. It was therefore not error for the court to acknowledge the turnover in this case and nonetheless conclude that OCS made active efforts.

---

[31] Caitlyn also argues that OCS conceded that her application to Women and Children's Center was not last minute and that nevertheless the superior court improperly characterized her attempt as coming on the eve of trial. However, the court reasonably looked at the lifetime of the case, concluding that Caitlyn "waited simply too long over this three-year period" and citing Caitlyn's periods of lost contact with OCS and failure to submit UAs. *See, e.g., S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1126 (Alaska 2002) (calling "too little, too late" a parent's attempts to get into treatment that would start after the trial).

[32] We further note that the same facts support the court's decision to decline to order OCS to place Bridget with Caitlyn at Women and Children's Center after Caitlyn moved for a review hearing under CINA Rule 19.1(d).

We also have stated that courts may consider "a parent's demonstrated lack of willingness to participate in treatment" in evaluating the sufficiency of OCS's efforts.[33] Caitlyn argues that OCS failed to make active efforts when it failed to apply to any rehabilitation programs on her behalf and timely update a case plan and family contact plan during the last six months before trial.[34] But an OCS caseworker testified that she filled out three applications with Caitlyn in the OCS office only to have Caitlyn drop out of communication around four months before trial, despite multiple calls and messages. Its inability to contact Caitlyn also prevented OCS from being able to set up a new visitation schedule after Sarah expressed safety concerns about hosting visits around the same time. And in evaluating OCS's efforts, the court properly considered Caitlyn's lack of participation over the course of the case when it emphasized Caitlyn's delay in getting treatment for her tuberculosis, discharge from PATC and Women and Children's Center, failure to submit UAs, and other periods of lack of contact with OCS.

Courts may also consider OCS's efforts toward the family as a whole in evaluating active efforts.[35] The superior court noted that during many of the time periods

---

[33]     *Maisy W.*, 175 P.3d at 1268 (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)).

[34]     Caitlyn also argues that OCS's failure to file an updated permanency report is further evidence of a failure to make active efforts. We accept the superior court's reasoning that OCS's omission "doesn't change [the] findings on the termination" because (1) the parties agreed that the children were still in need of aid and (2) Caitlyn was aware that the termination petition had been filed even as of the previous permanency report.

[35]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1115 (Alaska 2010). *See also* 2015 BIA Guidelines, *supra* note 12, at 10,150 (listing "[i]dentifying community resources including housing [and] financial . . . services and actively assisting the Indian child's parents or extended family in

(continued...)

in question, OCS was providing services to Sarah, Maggie, and Bridget. For example, during the time period that Caitlyn argues that the lost file constituted a lack of active efforts, OCS was helping get the family into better housing and obtain fuel oil and additional food. Similarly, Sarah testified about the support she received from OCS caseworkers who assisted her with confrontations with Caitlyn, including some during the last year of the case.[36] The superior court properly considered OCS's efforts toward the family as a whole.

Caitlyn's remaining argument, that OCS's failure to monitor her progress while she was at Women and Children's Center constitutes a lack of active efforts, is factually unavailing. Her attorney acknowledged that Women and Children's Center is a "long-term inpatient treatment program" which provides group and family therapy, mental health services, and anger management services in addition to substance abuse treatment. As such, it is not clear what additional services OCS could have provided during this time, other than arranging and paying for Caitlyn's travel to and from the program and arranging for Maggie to visit, which it did.[37] Caitlyn further argues that more detailed reports from her stay in this facility should have been included in the record, citing to the 2015 BIA Guidelines for the proposition that "[a]ctive efforts must

---

[35]     (...continued)
utilizing and accessing those resources" as an example of active efforts); 1979 BIA Guidelines, *supra* note 13, at 67,592 (efforts "shall also involve and use the available resources of the extended family").

[36]     The court did not find credible Caitlyn's testimony that Sarah, not she, instigated these confrontations.

[37]     *Cf. A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997) (calling "superfluous" any additional efforts OCS's predecessor could have made while an incarcerated parent was undergoing therapeutic services from the Department of Corrections).

be documented in detail,"[38] but it was not error for the superior court to credit OCS caseworkers' sworn testimony about the extent of services provided to Caitlyn and her family without requiring additional documentation.[39]

We therefore affirm the superior court's finding that OCS made active efforts to prevent the breakup of the Indian family.

## IV.    CONCLUSION

For the reasons explained above, the superior court's decision to terminate Caitlyn's parental rights is AFFIRMED.

---

[38]    2015 BIA Guidelines, *supra* note 12, at 10,156.

[39]    *Cf. Kent K. v. State, Dep't of Health & Soc. Servs.*, No. S-15708, 2016 WL 483254, at *8 (Alaska Feb. 3, 2016) (construing requirement broadly).