NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

LEONARD M., )
) Supreme Court Nos. S-18338/18372
    Appellant, ) (Consolidated)
)
 v. ) Superior Court Nos.
) 3AN-19-00602/00603 CN
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S SERVICES, ) <u>MEMORANDUM OPINION</u>
) <u>AND JUDGMENT</u>*
    Appellee. )
) No. 1945 – February 8, 2023
_____ )
)
MARA G., )
)
    Appellant, )
)
 v. )
)
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S SERVICES, )
)
    Appellee. )
_____ )

Appeal from the Superior Court of the State of Alaska, Third
Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Katrina Larsen, Ketchikan, for Appellant
Leonard M. Emily Jura, Assistant Public Defender, and

---

\*    Entered under Alaska Appellate Rule 214.

Samantha Cherot, Public Defender, Anchorage, for Appellant Mara G. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices. Carney, Justice, dissenting in part.

## I. INTRODUCTION

OCS assumed custody of two children due to substance abuse and domestic violence in the home. The Indian Child Welfare Act (ICWA) required that the Office of Children's Services (OCS) make active efforts to prevent the breakup of the family before terminating parental rights. The children's mother struggled to engage with OCS and her children during the child in need of aid (CINA) proceedings and continued to test positive for methamphetamine. One child's father, who was incarcerated for long periods during the case, had some contact with his son but made little progress on his case plan. The court terminated both parents' rights following trial. The day before the court's decision, the mother filed a motion to supplement the record with evidence of her recent substance abuse treatment.

The mother appeals, arguing that OCS failed to make active efforts to reunite the family, that the superior court erred in finding that the children would be at risk of substantial harm if returned to her care, and that the superior court erred in converting her motion to supplement the record into a motion for reconsideration. The father also appeals the superior court's active efforts finding. Finding no reversible error, we affirm the termination order.

## II.   FACTS AND PROCEEDINGS

### A.      Initial OCS Involvements

Mara is the mother of two children: Leland, born in 2017, and Mindi, born in 2019.[1] Both children are Indian children as defined in ICWA because of Mara's tribal affiliation.[2] Leland and Mindi have different fathers; Leland's father is Leonard and Mindi's father is Dennis. The superior court terminated the parental rights of all three parents. It is Mara's and Leonard's parental rights that are at issue in this appeal.

Leonard was incarcerated when Leland was born. He was released from custody in the summer of 2018 and had visitation with Leland facilitated by Mara. She discontinued these visits in late 2018 and filed for a protective order after Leonard came to one visit with razor blades in his mouth. Leonard was incarcerated again in early 2019, was released in January 2020, and in January 2021 was again incarcerated; he was still in prison when the termination trial took place later that year.

OCS began working with the family in October 2019 following reports that a gun had been fired in the home while the children were present and that Mara was using methamphetamine while caring for the children. OCS crafted an out-of-home safety plan, pursuant to which Mara agreed that the children would live with her mother, Sharon. Leonard, in custody at the time, did not participate because OCS initially could not locate him. OCS referred Mara for substance abuse treatment.

In late October OCS filed a non-emergency petition seeking temporary custody of both Leland and Mindi, which would allow OCS to provide Sharon with

---

[1]      Pseudonyms are used to protect the family's privacy.

[2]      *See* 25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

financial resources. The petition listed the fathers as "Unknown" and focused on Mara's drug use. In December, after Mara missed two case-planning meetings, OCS developed a case plan for her without her participation. A caseworker then informed her of the plan's objectives, which included attending parenting classes, continuing family contact, completing a drug assessment, obtaining stable housing, and meeting with the caseworker.[3] In January 2020 Mara stipulated to an adjudication that both children were "[c]hildren in need of aid" due to her substance abuse and Leonard's incarceration.[4]

## B. Lead-Up To Termination Petition

### 1. OCS's efforts with Mara

Caseworkers had difficulty keeping in touch with Mara from the beginning of the case. OCS scheduled her to participate in CINA therapeutic court, but she did not come to the hearing. She tested positive for methamphetamine four times in October and November 2019 before she stopped attending urinalyses (UAs). In November Leland urgently needed dental surgery, and OCS informed Mara that the dentist needed her consent to proceed with the treatment. Mara agreed to attend Leland's appointment to sign the consent forms, but she did not show up, and OCS had to ask the court for an order authorizing the surgery. Caseworkers tried to give Mara referrals for substance abuse treatment, but Mara did not provide contact information. OCS referred her to parenting classes, but she did not attend.

---

[3] Mara denies having been told of the plan's objectives, but she acknowledges that she was aware of its key elements.

[4] AS 47.10.011(2) (providing that court may find child in need of aid if "incarcerated parent has not made adequate arrangements for the child"); AS 47.10.011(10) (providing that court may find child in need of aid if parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

In early 2020 Sharon reported to OCS that Mara "rarely visit[ed]" her children despite being free to visit them at any time. Sharon further reported that the inconsistency of Mara's contact left Leland distraught after the visits that did occur. OCS created another case plan for Mara in June 2020, again without her input because of her failure to attend scheduled meetings. The case plan goals were similar to the earlier ones, with the addition of regular UAs. Over the next few months Mara missed follow-up meetings and did not answer or respond to the caseworker's phone calls.

In February 2021 OCS made a third case plan for Mara, again without her participation because of its inability to contact her. The case plan had similar goals as the earlier ones. That month Mara went to Southcentral Foundation on her own initiative and completed an intake assessment; she reported daily methamphetamine use and weekly heroin use, admitted to using drugs regularly since a 2019 relapse, and said she was homeless and "couch surfing." After the intake assessment, Mara failed to appear for follow-up meetings with the assessor. Mara completed a substance abuse assessment in April 2021 but did not disclose its results to OCS; the assessor expressed strong concerns for Mara's safety due to her substance abuse.

In August a new caseworker was assigned the case. He attempted to keep in contact with Mara and provided her a bus pass to get to treatment, but, according to his supervisor's later testimony, Mara refused to "engage" with him. He scheduled both Leland and Mindi for developmental assessments.

Acting on concerns first relayed by Mara's Tribe, OCS removed Leland and Mindi from Sharon's care and placed them with a foster family. The caseworker called Mara to explain the situation, but Mara did not call back. The caseworker also set in motion "a family contact referral . . . to help arrange for visitation for her," but at the time of trial visitation had not yet happened; the caseworker testified, however, that "they were hoping [it] would happen tomorrow."

### 2. OCS's efforts with Leonard

Leonard testified that an OCS caseworker first visited him in jail after Leland had been removed from Mara's care to inform him of the removal and the placement with Mara's mother. When he was released in mid-January 2020 he went to OCS, where he was given a pair of shoes. He had another meeting at OCS with his assigned caseworker, and they "put together . . . [his] parental parenting plan face to face." In early 2019 Mara had obtained a long-term protective order against him because of his behavior during past visitation, but Leonard was nonetheless able to have weekly supervised visits with Leland for a time while the child lived with Sharon. Leonard asked OCS to increase the visits to bi-weekly and OCS tried to accommodate him, but "there were some difficulties because of . . . the communication issue, phone issues, and COVID." And in-person visits tapered off once the pandemic began; on at least one occasion a visit fell through because Leonard failed to get a COVID test beforehand.

While not incarcerated Leonard struggled with homelessness and lacked dependable contact information. OCS "collected his mail for him" and made efforts to provide him a cell phone, though he denies receiving one. Leonard's case plan called for parenting classes and a domestic violence intervention program, but he informed OCS that he did not need help in those areas. He obtained a drug assessment — a requirement of his probation — which did not recommend treatment, finding him "not motivated." The assessor noted that Leonard "[m]ay be minimizing [his] substance use" and that he admitted to dealing drugs while raising his children but did not seem to find this concerning. The assessment recommended parenting classes and moral reconation therapy.

Leonard was arrested in January 2021 for domestic violence and was again incarcerated. At the termination trial he testified that OCS did not contact him again until July. An OCS supervisor testified that a caseworker had talked to Leonard by

phone on June 25. Another caseworker assumed responsibility for the file in mid-August and went over Leonard's case plan with him by phone on August 30. They also discussed visitation, but Leonard did not want his son to visit him while he was incarcerated and "hav[e] that experience at . . . the correctional facility." OCS tried to arrange telephonic visits instead, but the prison required those to be by court order. OCS helped Leonard send letters to Leland and receive letters and pictures. But Leonard did not complete any of his case plan goals.

### C.    Termination Trial

The court held a termination trial in September and October 2021. Witnesses included a police officer, who testified about Leonard's most recent arrest for domestic violence, four OCS employees, expert witness Karen Morrison, and the children's parents.

The caseworkers testified about their efforts with Mara and Leonard. They testified about OCS's difficulties reaching Mara and maintaining contact. They described their concerns with substance abuse and domestic violence. They characterized Mara's substance abuse as "out of control" and testified that Leonard had not made the "significant behavior changes" required for reunification. They testified that OCS made efforts with both parents and that neither responded.

OCS presented Morrison as an expert "based on Native child-rearing and welfare practices." She testified that she had worked for OCS for over 17 years and was often qualified as an ICWA expert witness due to her extensive experience. Based on a records review, she testified she did not think either parent could provide the children "adequate care and control" because of Mara's substance abuse and Leonard's incarceration and history of domestic violence. She testified about the harm that parental substance abuse, domestic violence, and incarceration can cause to children, and she also said that the parents' lack of behavioral changes caused her significant concerns about

Mindi's and Leland's safety.

Mara testified that the past few years had been difficult for her. She testified that she struggled with "unsteady emotions" and depression, which made it difficult to engage with OCS. She claimed no one had told her about her case plan, but she admitted knowing she was supposed to get an assessment and attend UAs. She explained that she had stopped attending UAs for the "mental stability of [her] own health." She testified that she had financial difficulty keeping her phone active and acknowledged that "it might be a little late" to start working on her case plan and get her children back.

Leonard testified that he applied for Medicaid and food stamps by himself. He claimed that he reported to OCS multiple times and was turned away because no one was there to see him (though it is unclear from the record whether OCS should have anticipated his visits). He acknowledged that OCS gave him bus passes but denied that it gave him a phone. He admitted knowing that OCS wanted him to submit to UAs but thought it was "not a necessity." He testified that before his incarceration he had six or seven visits with Leland and that it then took half a year to get pictures of the child during his incarceration. When asked why he did not follow through on his case plan, particularly the requirement of parenting classes, Leonard testified that after the pandemic began he was waiting for more direction from OCS.

### D.    Post-Trial Efforts And Termination Order

At the end of the trial, the court announced it would take the matter under advisement. It noted that OCS remained obligated to make active efforts to reunite the family, including assisting Mara to get into substance abuse treatment if possible.

An OCS caseworker and Mara contacted residential treatment providers together. The caseworker scheduled a meeting with Mara in October 2021 to review treatment applications and give her a bus pass, but Mara did not come to the appointment

or answer phone calls. She began detox later that month after testing positive for methamphetamine. Leonard failed to appear for a scheduled meeting with OCS at the prison on October 15. In a November 2021 report preceding a permanency hearing, OCS reported a lack of progress on both case plans.

In February 2022 the superior court issued its written order terminating all three parents' parental rights. The court found by clear and convincing evidence that the children were in need of aid due to parental substance abuse, a substantial risk of harm, neglect, and abandonment.[5] The court also found that all three parents had failed to remedy the conduct that put their children at risk.[6]

The court acknowledged that OCS's efforts in the case were "certainly not perfect," but it found that OCS nonetheless provided reasonable and active efforts given the "totality of the circumstances." In Mara's case, the court found that OCS's referrals for UAs, CINA therapeutic court, and substance abuse treatment constituted reasonable and active efforts given Mara's minimal engagement. In Leonard's case, the court found that although he engaged in visitation, his approach to other aspects of his case plan amounted to only " 'token' efforts."

The court also found evidence beyond a reasonable doubt that the children were "likely to suffer serious physical or emotional harm" in their parents' care.[7] To support this finding the court listed Mara's active use of methamphetamine, the history of domestic violence in the home, the incarcerated fathers' long-term absences, and Leonard's concerning behavior selling drugs and attending visitation with razor blades

---

[5]     AS 47.10.011 (1),(6),(9), and (10)

[6]     AS 47.10.088(a)(2)(B).

[7]     AS 47.10.088(b)(4).

in his mouth. The court also pointed to Morrison's "essentially uncontroverted" expert testimony that the children would be at risk if returned to Mara's home.

### E.       Post-Trial Proceedings

Mara filed a motion to supplement the trial record the day before the court issued its written order, asking the court to consider evidence that she completed residential treatment after trial. The court had been unaware of this motion when it issued the termination order. At a status hearing later that month, the court stated its intention to treat the motion like a motion to reconsider, and Mara's attorney responded, "Yes, Your Honor."

OCS, the guardian ad litem, and the Tribe all opposed the motion on both procedural and substantive grounds. The court denied the motion "[f]or the reasons stated by the responding parties."

Mara and Leonard appeal the termination of their parental rights.

## III.    STANDARDS OF REVIEW

"Whether OCS made active efforts . . . as required by ICWA is a mixed question of law and fact."[15] "Whether substantial evidence supports the trial court's conclusion that a child is likely to be seriously harmed if returned to her parent is a mixed question of fact and law . . . .."[16] "We review factual findings for clear error, reversing only if, after 'review of the entire record,' . . . we are left 'with a definite and firm conviction that a mistake has been made.' "[17] "Whether the superior court's factual

---

[15]    *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013).

[16]    *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

[17]    *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*,
(continued...)

findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[18]  "We 'bear in mind at all times that terminating parental rights is a drastic measure.' "[19]  "We review a superior court's ruling on a party's request to reopen evidence for abuse of discretion."[20]

## IV.    DISCUSSION

### A.    It Was Not Error To Conclude That OCS Made Active Efforts To Reunite Mara With Her Children.

ICWA requires that "[b]efore terminating parental rights to an Indian child, a court must find [by clear and convincing evidence] that 'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' "[21]  These efforts "must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."[22]  But "the active efforts

---

(...continued)
490 P.3d 357, 365 (Alaska 2021) (omission in original) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009)).

[18]    *Id.*

[19]    *Jon S.*, 212 P.3d at 761 (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008)).

[20]    *Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015).

[21]    *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 651 n.6, 654 (Alaska 2017) (quoting *Jon S.*, 212 P.3d at 760-61), *superseded by regulation on other grounds as recognized in Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 177 (Alaska 2019); *see also* 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a) (2016); CINA Rule 18(c)(2)(B).

[22]    *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511
(continued...)

requirement does not require perfection."[23]  The court "may consider all services provided during the family's involvement with OCS."[24]  The court may also consider a parent's willingness to participate in services, though ultimately the active efforts finding must turn on OCS's efforts, not the parent's.[25]

The evidence supports the superior court's finding that OCS made active efforts to reunify Mara with her children.  OCS created an out-of-home safety plan with Mara and filed the temporary petition for custody so that it could financially support the children and keep them with Mara's mother.  OCS scheduled Mara for CINA therapeutic court, developed a case plan for her in December 2019, and communicated the case plan's objectives to her.  Caseworkers provided referrals for treatment, scheduled her for UAs, and allowed her to visit her children any time.  OCS created subsequent case plans in June 2020 and February 2021.  It worked with the Tribe to find a safe placement for the children and tried to coordinate home visits.

Throughout the case, OCS caseworkers continued to reach out to Mara despite her failure to answer and return calls or show up for appointments.  Mara claims that OCS made no meaningful effort to get her into treatment, but the record shows that OCS tried to give her bus passes for that purpose and helped her contact residential treatment providers.  Some of these efforts followed trial, but Mara had earlier insisted she was "not ready" for treatment.  She acknowledges that she struggled to engage with

___

(...continued)
P.3d 553, 561 (Alaska 2022) (omissions in original) (quoting 25 C.F.R. § 23.2 (2021)).

[23]  *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[24]  *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[25]  *Mona J.*, 511 P.3d at 562-63.

OCS but contends that there is no evidence OCS attempted to talk to her about her concerns with treatment, instead simply making referrals and leaving her to pursue them on her own. But the record supports a finding that the caseworkers were fairly persistent in their attempts to stay in touch with her;[26] they could not have the necessary conversations with a parent who avoided contact.

Mara argues that the trial court improperly focused on her efforts instead of OCS's. We reiterate our conclusion in *Mona J. v. State, Department of Health & Social Services, Office of Children's Services* that "the analysis of active efforts under ICWA turns primarily on OCS's actions, not on the parent's response."[27] In this case, however, although OCS's efforts were not perfect, they pass the threshold of active efforts.

**B.      It Was Not Error To Conclude That OCS Made Active Efforts To Reunite Leonard With His Son.**

Whether OCS provided active efforts to reunite Leonard with his son is a much closer call ("a more complex situation," in the words of the superior court). We conclude that the record provides adequate support for the superior court's finding.

OCS remains obligated to prove active efforts to an incarcerated parent, but the "practical circumstances" of incarceration can be a factor in evaluating those efforts.[28] "OCS's reunification efforts on behalf of the non-incarcerated parent" are relevant and

---

[26]      The record shows OCS's attempts to reach Mara by phone, videoconference, and in person at her home. When Mara missed a meeting, OCS would reschedule it.

[27]      511 P.3d at 562.

[28]      *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (recognizing that "the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration [] may have a direct bearing on what active remedial efforts are possible").

important in evaluating "OCS's efforts towards the incarcerated parent"; when one parent is incarcerated, courts may consider the active efforts given to the other parent in deciding whether OCS met its statutory burden.[29]

After assuming custody of Leland, OCS met with Leonard at the correctional facility to inform him of its intent to place Leland with Mara's mother. OCS created a case plan for Leonard, went over it with him in person after his release in January 2020, and coordinated weekly visitation with Leland. Leonard asserts that OCS was mostly unresponsive to his requests to increase the frequency of these visits. But caseworker testimony supports a conclusion that OCS made efforts to increase visitation but was stymied for a variety of legitimate reasons, including the pandemic.

OCS successfully referred Leonard for a substance abuse assessment — though the assessment resulted in a "[n]o treatment" recommendation because of his lack of motivation — and scheduled him for UAs. The testimony at trial supports a finding that OCS caseworkers gave Leonard shoes, collected his mail both while he was incarcerated and while he was homeless, made efforts to provide him a cell phone, and gave him weekly bus passes.

OCS's efforts toward Leonard during his 2021 incarceration concern us most. OCS does not dispute that it failed to contact him for six months after his January 2021 arrest, then only providing photos of Leland. But when the new caseworker met with Leonard in August, it was evident that options for in-person contact were limited because of Leonard's desire that his son not see him in the prison setting.

OCS clearly could have made more extensive efforts to assist Leonard with his case plan. The testimony about OCS's active efforts is vague, and because of that the time line is difficult to untangle. However — particularly when we also consider OCS's

---

[29] *Josh L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 457, 466 (Alaska 2012).

more consistent, but also unsuccessful, efforts directed toward Mara as the unincarcerated parent[30] — the evidence is barely sufficient to support a finding that OCS did actively engage with Leonard. In *Dashiell R.* we observed that OCS "failed to facilitate communication between [the father] and the children for the majority of his incarceration" and did not create a case plan for him until two years into its involvement with his family.[31] The superior court found "that the state's efforts were heavily oriented towards the mother, that Dashiell's incarceration impacted the efforts the state could make, and that the state made efforts at visitation and written communication, albeit imperfectly."[32] We affirmed termination of the father's parental rights, noting that under the circumstances OCS's efforts directed toward the mother were "an important aspect of the state's active efforts to keep the family together."[33] In this case, likewise, we conclude that the superior court did not err by finding that OCS's efforts satisfied the statutory standard.

C. **The Superior Court Did Not Clearly Err By Determining That Leland and Mindi Were Likely To Suffer Serious Harm If Returned To Mara's Custody.**

We also conclude that the superior court did not clearly err by determining that Mara's children would likely be seriously harmed if returned to her. Under ICWA, to terminate parental rights the court must find "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to

---

[30] *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009).

[31] *Id.* at 849.

[32] *Id.*

[33] *Id.* at 850.

the child."[34] This finding must be grounded in proof that (1) the parent's behavior will likely cause future harm to the child and (2) the parent is unlikely to change her behavior.[35] The court's mandate is to determine future harm, but it may partially rely on "past failures" to "predict future conduct."[36] An expert must testify, but the expert's opinion need not alone establish the required likelihood of harm.[37] The court may consider lay witnesses and other evidence in addition to expert testimony.[38]

Here, the superior court based its finding of a serious risk of harm on: (1) Mara's ongoing substance abuse issues; (2) Leonard's history of domestic violence; and (3) Leonard's drug dealing. Mara correctly argues that the expert's testimony provided an "extremely generalized" opinion about drug users. But other evidence in the record supports the court's finding.[39] The evidence showed that Mara has a serious substance abuse problem. Her testimony acknowledged debilitating depression and an inability to engage with others, and the court could reasonably conclude that she failed to understand the seriousness of her addiction and its impact on

---

[34]    25 U.S.C. § 1912(f).

[35]    *Marcia V. v. State, Off. of Child Servs.*, 201 P.3d 496, 503 (Alaska 2009).

[36]    *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 767 (Alaska 2009).

[37]    *Kent K. v. State, Dep't. of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-15708, 2016 WL 483254, at *3 (Alaska Feb. 3, 2016).

[38]    *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

[39]    *See Jon S.*, 212 P.3d at 767 ("The record contains substantial evidence of [the father's] past pattern of making choices that led to incarceration or that caused him to disappear from [his daughter's] life, demonstrating his instability and inability to parent.").

her children or how to be a safe parent.  The court did not err by finding that Mara's children would likely be seriously harmed if returned to her care.

> **D.**     **It Was Error To Convert Mara's Motion To Supplement The Record Into a Motion For Reconsideration, But The Error Was Harmless.**

Mara also contends that it was error to convert her post-trial motion to supplement the record into a motion for reconsideration; we agree although we conclude that the error was harmless.[40]  As Mara points out, a court should view the two kinds of motions quite differently:   a motion for reconsideration is decided on the existing record,[41] whereas a motion to supplement the record — filed, as was Mara's, before the court issues its decision — is an appropriate vehicle for asking the court to first hear new evidence.  And a trial court enjoys "large discretion . . . in permitting a party to reopen [evidence] after it has rested."[42]

Mara filed her motion to supplement the record the day before the superior court issued its written order.  Proper consideration of the motion would include considering the importance of the new evidence, Mara's diligence in presenting it, and the potential prejudice to OCS.[43]  But although the court said it was converting the motion into a motion to reconsider, the parties briefed it as if it were, as titled, a motion

---

[40]     OCS argues that Mara waived this argument because when the superior court said it would convert the motion to one for reconsideration, Mara's attorney responded, "Yes, Your Honor."  The response could be agreement or could be simple acknowledgment of the court's intention; we choose to address the issue.

[41]     *See* Alaska R. Civ. P. 77(k) (identifying grounds for reconsideration, including that court has overlooked controlling law, a material fact, or "a material question in the case"); *Hodari v. State, Dep't of Corr.*, 407 P.3d 468, 472 (Alaska 2017) ("[C]ourts will ordinarily not consider new evidence in a motion for reconsideration.").

[42]     *Miller v. State*, 462 P.2d 421, 428 (Alaska 1969) (quoting *Massey v. United States*, 358 F.2d 782, 786 (10th Cir. 1966)).

[43]     *Snider v. Snider*, 357 P.3d 1180, 1186 (Alaska 2015).

to supplement the record. OCS, the guardian ad litem, and the Tribe argued that the court should deny the motion on substantive as well as procedural grounds. Both OCS and the Tribe focused on permanency, arguing that despite Mara's completion of residential treatment she would still need to maintain at least six months of sobriety before she could be considered a safe placement for the children. The superior court summarily denied Mara's motion "[f]or the reasons stated by the responding parties." Because we agree that the evidence, even if added to the record, would not change the result, the court's conversion of the motion was harmless error.

## V.     CONCLUSION

We AFFIRM the superior court's order terminating Mara's and Leonard's parental rights.

CARNEY, Justice, dissenting in part.

Although I agree with the court's conclusion regarding Mara, I disagree that the record supports a finding that OCS made active efforts toward Leonard.

Despite the caseworker's knowledge of Leonard's identity, OCS's "petition listed the fathers as 'Unknown' " and focused solely on the mother.[1]  The caseworker testified that he sent an email to the Anchorage Correctional Center about Leonard and received no answer.  "[T]hen on the same day" the caseworker "did a VINELink check to see if [the other child's father] was incarcerated;" he did not, however, check to see about Leonard's status.  When questioned about his efforts to locate Leonard, the caseworker acknowledged that there was no documentation of any effort to find Leonard via VINELink as required by AS 47.10.086(a)(3).

OCS began to provide services to Leonard after his release from jail in mid-January 2020 as the court recognizes.[2]  The court credits OCS for "coordinat[ing] . . . weekly visitation with Leland,"[3] but it fails to also note that those visits began in January (or possibly February) 2020 and ended at the start of the pandemic, which was March 2020.[4]  From March until his return to jail on January 2, 2021, Leonard had a few Zoom or "Child Facebook" visits with Leland.

I agree with the court that OCS's lack of effort while Leonard was incarcerated is the most concerning, but for me it is the tipping point.  This case ran from October 5, 2019 through trial in late October and November 2021.  OCS made no efforts toward Leonard from October 2019 through January 2020 (3 1/2 months).  It made some

---

[1]     Op. at 4.

[2]     Op. at 6.

[3]     Op. at 14.

[4]     Op. at 14.

efforts while he was out of jail throughout 2020 — efforts which, in light of Leonard's lack of engagement, I think qualify as active enough. But "OCS does not dispute it failed to contact him for six months after his January 2021 arrest, then only providing photos of Leland."[5] And that contact occurred only because Leonard's attorney apparently included OCS in a phone call she was having with Leonard.[6]

OCS made virtually no efforts during the final ten to eleven months of the case. We do not determine active efforts by simply tallying the months with and without effort.[7] But in Leonard's case the fourteen months during which OCS made no effort at all toward reunifying him with his son outweigh the year or so of barely-active efforts OCS actually made.

The court also points out that we have affirmed an active efforts finding when OCS has focused its efforts on the parent who was not incarcerated.[8] But in doing so the court overlooks the very different facts of that case. The father in *Dashiell R.* was incarcerated for the entire time the case was pending and would not have become eligible for release from incarceration for at least four years after the termination trial.[9] Leonard, on the other hand, was out of jail as much as he was in.

---

[5]      Op. at 14.

[6]      The court excuses OCS's failure to provide anything more than photos by pointing to the lack of "options for in-person contact." Op. at 14. But OCS knew that it could obtain a court order for telephone contact between Leonard and his son.

[7]      We have affirmed a finding of active efforts over the entirety of a case even where there were significant lapses in OCS involvement. *Philip J. v. State Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 528 (Alaska 2013) ("inadequate efforts in one period of state involvement do not render the entirety of the state's efforts inadequate, even when that period lasts for a matter of months").

[8]      Op. at 20 n.30 (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009)).

[9]      *Dashiell R.*, 222 P.3d at 843-44.

I would conclude that OCS failed to make active efforts toward Leonard, vacate the order terminating his parental rights, and remand for further proceedings.  I therefore respectfully dissent from that portion of the court's decision.